CORRECTED COPY

# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
BURTON, HAGLER, and FLEMING
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Specialist COREY N. WALL**
**United States Army, Appellant**

ARMY 20160235

Headquarters, Fort Carson
Lanny Acosta, Military Judge
Colonel Gregg A. Engler, Staff Judge Advocate

For Appellant: Lieutenant Colonel Christopher Carrier, JA; Major Brendan R. Cronin, JA; Captain Cody Cheek, JA (on brief); Lieutenant Colonel Christopher Carrier, JA; Captain Patrick Hoffman, JA; Captain Heather Martin, JA; Captain Cody Cheek, JA (on reply brief).

For Appellee: Colonel Tania M. Martin, JA; Major Michael E. Korte, JA; Captain Marc B. Sawyer, JA (on brief).

5 October 2018

-----------------------------------
MEMORANDUM OPINION
-----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

BURTON, Senior Judge:

Specialist Corey N. Wall appeals his convictions for one specification of sexual assault of Private First Class ES and one specification of rape of Private AM.[1] In his sole assignment of error, appellant asks that we set aside his convictions in

---

[1] Both PFC ES and PV2 AM were promoted to Specialist (SPC) between the preferral of charges and the time of court-martial. They are referred to as SPC throughout this opinion.

light of *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016) and *United States v. Hukill*, 76 M.J. 219 (C.A.A.F. 2017).[2]

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of sexual assault and rape in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 (2012) [UCMJ]. The military judge sentenced appellant to a dishonorable discharge, confinement for 15 years, forfeiture of all pay and allowances, and reduction to Private E-1. The military judge credited appellant with sixty days' credit against confinement for illegal pretrial punishment under Article 13, UCMJ. The convening authority approved the adjudged sentence.

This case is before us for review under Article 66, UCMJ.

Here, the factfinder considered the evidence of each charged offense as propensity evidence for the other charged offense. We find this was error for both offenses, and it was prejudicial error for one of the specifications, warranting relief which we will issue in our decretal paragraph.

## BACKGROUND

### 1. *Rape of SPC AM* (*Specification 2 of The Charge*)

On 16 March 2014, appellant, and several other soldiers went to a nightclub, then to a hotel room at the Comfort Inn, outside of Denver, Colorado and Fort Carson. These soldiers included appellant, PFC MS, SPC MB, and SPC AM. Specialist MB passed out. After SPC MB passed out, appellant, PFC MS, and SPC AM drew pictures on SPC MB, and on each other.

Specialist AM testified she, appellant and PFC MS played a drinking game called "flip cup," and then progressed to a game of "truth or dare." Specialist AM downloaded an application on her phone that created "dares." When it was SPC AM's turn for a dare, appellant and PFC MS took SPC AM's phone and read her dares. Specialist AM testified she did not know the dares had sexual components to them since she downloaded the application in the moment. Appellant and PFC MS first dared SPC AM to remove her shirt, and she did. Then they dared her to remove her bra, which she did. She placed a pillow in front of her chest to cover herself. According to SPC AM, appellant and PFC MS "snatched" the pillow from her, leaving her breasts exposed, and the next thing she recalled was getting blindfolded with a pillowcase. Appellant and PFC MS then moved her to the other bed. Specialist AM testified she was still blindfolded when appellant and PFC MS began to kiss her and someone began to put their hand in her shorts. She testified she grabbed that person's arm to take it out of her shorts, and she thought they would

---

[2] We have considered the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find they warrant neither discussion nor relief.

stop once they noticed she had on a pad and was on her menstrual cycle. Specialist AM testified she said "please stop," and that she didn't want to do this. Someone said "shut up. It's okay." Specialist AM testified both appellant and PFC MS engaged in unwanted sexual intercourse with her.

Specialist AM eventually got away from appellant and PFC MS. She grabbed her phone and locked herself in the bathroom. She tried to call several people on her phone and eventually reached SPC NM, another Soldier in her unit. She spoke with SPC NM, crying, and relayed to him that she had been sexually assaulted. While she was on the phone with SPC NM, appellant banged on the door and demanded she open it. She eventually opened the door, but kept the phone on. Appellant entered the bathroom and told SPC AM, "You better not tell anybody anything. It was fucking consensual."

Specialist NM testified SPC AM sounded frightened on the phone and that she said she had been raped. He testified he heard another voice, but was not able to make out what was said. Specialist NM ordered a taxi to take SPC AM from the hotel in Denver back to Fort Carson. The next day, SPC AM went to the hospital where a forensic nurse examiner conducted a complete examination. A genital injury consistent with SPC AM's narrative was documented. The nurse examiner also noted SPC AM was menstruating at the time of the exam.

Under a grant of testimonial immunity, PFC MS testified he, appellant, and SPC AM were not drinking, and he did not see any drinking or drinking games the entire time he was in the room. Rather, once they finished drawing on SPC MB, they proceeded directly to the "truth or dare" game after appellant suggested SPC AM engage in sex acts with him or PFC MS.

Private First Class MS corroborated SPC AM's testimony that she was blindfolded, although he claimed the blindfold was only over her eyes for the duration of one dare. He also corroborated that she initially covered her breasts with a pillow, but claimed she put the pillow to the side after a short while. He further corroborated that while he was digitally penetrating SPC AM, she put her hand on his hand. In contrast to SPC AM who testified she was trying to remove his hand, PFC MS claimed she held his hand down. The remainder of PFC MS's testimony consisted of his claim that SPC AM consented to the sexual intercourse, did not say no (after her initial declination before the truth or dare game), and appellant and he both engaged in sexual intercourse with SPC AM.

Private First Class MS further testified after he had sexual intercourse with SPC AM he tried to get her to engage in oral sex by placing his penis near her face, but she said, "No, I can't." According to PFC MS, his response was to say "[a]ll right" and to go sit at the front of the bed. He then testified appellant engaged in sexual intercourse with SPC AM, and that appellant was "rougher" in that his "strokes were harder." According to PFC MS, SPC AM let out a sound that was "in between like a cry and a moan," and then she suddenly separated herself from

appellant and ran to the bathroom. Private First Class MS testified that he was "shocked, a little annoyed" because she left them and escaped to the bathroom. He and appellant "went to go see what was wrong." He testified SPC AM "seemed pretty upset" when he saw her outside the bathroom later.

Special Agent MF testified he interviewed appellant. Special Agent MF testified appellant told him he was able to convince SPC AM to agree to have sexual intercourse by kissing her, and then towards the end, she told him "stop, no," or something to that effect, but he continued having sex with her for a few seconds until she physically moved herself away from him. Special Agent MF asked appellant if he thought he was too rough with SPC AM to which appellant replied he believed he was and that he hurt her, and that is why she wanted to stop.

### 2. Sexual Assault of SPC ES (Specification 1 of The Charge)

In mid-June 2014, SPC ES and appellant went to a nightclub in Colorado Springs. Prior to going to the club, appellant purchased an alcoholic beverage called "Four Loko." They arrived at the club and drank the Four Loko before going inside. Specialist ES consumed a few drinks in the club, felt dizzy and went back to the vehicle where she sat in the front passenger seat and put on her seatbelt. Eventually, appellant went out to the car. He got into the driver's seat and placed his Four Loko in the middle console cup holder.

Specialist ES remembered being very intoxicated when appellant reached over and unbuckled her seatbelt. He then unbuttoned her pants and put his hand inside her pants over her genitals, telling her, "It's okay. I just want to touch it." Appellant then inserted his fingers inside SPC ES's vagina, unzipped his pants and pulled out his erect penis and put it into her mouth. Appellant then pushed back his seat and pulled SPC ES on top of him and placed his penis inside of her vagina. SPC ES apparently blacked out and her next memory was being back at the barracks. She testified that she recalled getting out of the car and screaming to two nearby Soldiers, PFC JJ and PFC CB, "[p]lease don't let me go with Wall." The next day SPC ES denied remembering anything from the incident. She did not report the assault until February 2015.

One of the soldiers, PFC SB, who was with appellant and SPC ES at the nightclub testified. Appellant was actually driving PFC SB's vehicle that evening. Private First Class SB testified appellant parked her vehicle about five spaces from the door of the club. When PFC SB got to her car at the end of the night, SPC ES and appellant were already inside. According to PFC SB, SPC ES did not appear disheveled, or upset, but did appear intoxicated. Private First Class SB testified SPC ES did not say anything about appellant when she got to the car or during the ride home. When they got back to the barracks, SPC ES got out the car and started screaming about appellant. When PFC SB saw her the next day, SPC ES did not remember what she said about appellant the previous night.

## LAW AND DISCUSSION

### A. *The Misuse of Military Rule of Evidence 413 for Charged Offenses*

In *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016) our superior court held it is impermissible to use evidence of charged offenses as Mil. R. Evid. 413 propensity evidence against an accused for other charged offenses. *Hills* was a members case, where the military judge gave an instruction that allowed the members to make such inappropriate use of the evidence. Because the erroneous instruction implicated constitutional dimensions, the test for prejudice was the harmless beyond a reasonable doubt standard. This standard is whether the government can prove, "beyond a reasonable doubt, the error did not contribute to the defendant's conviction or sentence." *United States v. Wolford*, 62 M.J. 418, 420 (C.A.A.F. 2006) (quoting *United States v. Kreutzer*, 61 M.J.293, 298 (C.A.A.F. 2005)). The following year, C.A.A.F. clarified that regardless of forum, "the use of evidence of charged conduct as [Mil. R. Evid. 413] propensity evidence for other charged conduct in the same case is error." *United States v. Hukill*, 76 M.J. 219 (C.A.A.F. 2017). Likewise, having found error of constitutional implications, each erroneous admittance of evidence must be tested for prejudice under the harmless beyond a reasonable doubt standard. *United States v. Hukill*, 76 M.J. at 222. An error is not harmless beyond a reasonable doubt, therefore, when there is a reasonable possibility the error complained of might have contributed to the conviction. *United States v. Moran*, 65 M.J. 178, 187 (C.A.A.F. 2007); *United States v. Chandler*, 74 M.J. 674, 685 (Army Ct. Crim. App. 2015).

### B. *The Application of Military Rule of Evidence 413 in This Case*

The government charged appellant with two specifications of violating Article 120, UCMJ. Prior to trial, the government provided notice "Pursuant to Military Rule of Evidence 413" of its intent to use evidence of charged conduct "to show the accused's propensity or predisposition to engage in sexual offenses." This notice did not provide any differentiation based on forum selection. The government included this notice in its "Motion for Non-Standard MRE 413 Instruction." In this motion, the government cited Mil. R. Evid. 413 in claiming that "proof of one offense of sexual [assault] is admissible to prove the accused committed another sexual offense" and "*this rule is the same regardless of whether the sexual offenses are charged or uncharged.*" After appellant selected a trial by military judge alone, the military judge stated the government's instructional request was "moot."

During trial, the military judge allowed the government to repeatedly argue the use of charged conduct as propensity evidence to commit other charged conduct under Mil. R. Evid. 413. In fact, the trial counsel started his closing argument, ended his closing argument, and ended his rebuttal closing argument by referencing propensity:

Your Honor, at the beginning of this trial, we told the court—the government told the court that this is, essentially, two cases tied together by the callous and criminal actions of the accused. We would like the court to think of these cases as two cables in a rope. So, we have two strong cables in this rope and that even to this extent the court thinks the defense's questions or evidence has identified minor flaws in those cables that 413 allows the court to, essentially, twist them together, to consider the evidence of both charges, and that when you do that it, essentially, creates a rope and that strengths [sic] whatever weakens [sic] might be present in either of these cases, and to consider that the accused has the propensity to commit these types of crimes. The government asks the court to consider that there are a number of similarities in these cases; junior Soldiers, young, isolated, intoxicated. The accused takes advantage of Soldiers in this type of situation and he's done it twice, and we would ask the court, therefore, to find him guilty of the charged offenses.

After appellant's court-martial, *Hills* was decided. Following this decision, the defense filed a motion for a post-trial session under Article 39(a), UCMJ. The defense asserted *Hills* represented a "substantive change in the law" regarding Mil. R. Evid. 413 so the use of this rule during SPC Wall's court-martial was improper. During the post-trial 39(a) session, the military judge provided his account of events:

For the record, prior to the day before trial in this case as scheduled, the forum selection in this case was an enlisted panel. The government provided notice of its intent to introduce [Mil. R. Evid.] 413 evidence in this case. The evidence that the government sought to admit was the other charged misconduct. There are two specifications of Article 120, and the government sought to use those specifications as [Mil R. Evid.] 413 evidence for the other specification, respectively. Additionally, the government sought an instruction regarding consideration of the other charged misconduct as 413 evidence. Because the evidence was admissible under [Mil. R. Evid.] 401, as the evidence sought to be admitted was charged misconduct, the court effectively deferred the ruling on that issue. Following a change in forum on the day prior to trial, the court did not rule upon the instruction because the issue was mooted by the change in the forum selection. Neither the government, nor the defense pursued the issue further.

Accordingly, the court did not rule on whether the charged misconduct in Specification 1, and the charged misconduct of Specification 2, could be considered as [Mil. R. Evid.] 413 evidence, nor was the court asked to make such a ruling by either party. There's no question as to the general admissibility of the evidence, but rather as to its

6

admissibility as [Mil. R. Evid.] 413 evidence. Following the presentation of evidence, the government presented argument which included an argument for the court to consider the offenses – the charged offenses and charged misconduct as [Mil. R. Evid.] 413 evidence. The defense did not object to this argument; however, the defense argument did include argument that the court should not consider the charged offenses as [Mil. R. Evid.] 413 evidence.

During the post-trial 39(a) session, the defense counsel asserted the government's "pervasive use" of Mil. R. Evid. 413 was subsequently "not allowed by *United States v. Hills*." The defense counsel added that "*Hills* makes it very clear that 413 evidence cannot be used for [an offense in] which an accused has pled not guilty" and "the fact that the case has been able to get to completion and then have after-the-fact – the change in law that is not a small change in law, but a great change in law, I think weighs heavily in favor of Specialist Wall." The defense counsel also countered the government's assertion that judge-alone cases fell outside the scope of *Hills*. More specifically, the defense counsel argued, "I think the notion between judge alone and panel really doesn't – it should not affect the analysis," as "[i]t's the same principle with the military judge versus the panel."

## C. Effect of the Ruling in This Case

This case was tried prior to *Hills* or *Hukill*, but it is clear from the record that the military judge inappropriately admitted the evidence of the charged offenses as Mil. R. Evid. 413 propensity evidence for the other charged offenses. This is error. Because the presumption of innocence implicates constitutional dimensions, we must test for prejudice under the harmless beyond a reasonable doubt standard.

The evidence with respect to Specification 2 is overwhelming. The government's case was very strong. Appellant's own statements to Special Agent MF were damning, as he admitted SPC AM said "no," had to push herself away, and he was too rough with her. SPC AM's testimony was corroborated by PFC MS in many respects as illustrated above. Where he did not corroborate her testimony, PFC MS's assertions where fanciful, weak, and self-serving, despite his grant of testimonial immunity. SPC NM also corroborated SPC AM's testimony regarding her being in the bathroom, although he could not attribute to whom the other voice he heard belonged, or what was said; he could tell SPC AM was frightened so much he ordered her a taxicab from Denver to Fort Carson. We are therefore convinced beyond a reasonable doubt the evidence of Specification 1 did not contribute to the conviction on Specification 2.

On the other hand, we cannot be convinced beyond a reasonable doubt the evidence of Specification 2 did not contribute to the conviction on Specification 1.

WALL—ARMY 20160235

The government's evidence on Specification 1[3] was not strong, especially in light of the potential for the misuse of the propensity evidence.

## CONCLUSION

Upon consideration of the entire record, the finding of guilty of Specification 1 of The Charge is set aside. The remaining finding of guilty is AFFIRMED. The sentence is set aside. The same or a different convening authority may: 1) order a rehearing on Specification 1 of The Charge and the sentence; 2) dismiss Specification 1 of The Charge and order a rehearing on the sentence only; or 3) dismiss Specification 1 of The Charge and reassess the sentence, affirming no more than a dishonorable discharge, confinement for ten years, total forfeiture of all pay and allowances, and reduction to E-1.[4]

Judge HAGLER and Judge FLEMING concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

---

[3] Corrected

[4] In reassessing the sentence we are satisfied that the sentence adjudged, absent Specification 1 of The Charge, would have been at least a dishonorable discharge and confinement of ten years. *See United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986) and *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013). The reassessment being both appropriate and purging the record as it stands of error does not otherwise limit the sentence that may be adjudged at a rehearing. *See* UCMJ, art. 63.

8